AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| ROBERT S. WONG, a/k/a "Fei Hong," | ) | Case No. |
| JEE CHUNG WONG, a/k/a "Choong," | ) | |
| and ZI XIAN LI, a/k/a "Jimmy" | ) | |
| | ) | |
| *Defendant(s)* | ) | |

FILED

JUN 22 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

3 17 70857

MEJ

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 2015 to June 20, 2017___ in the county of ___San Francisco___ in the
___Northern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 United States Code § 892 | Making extortionate extensions of credit |
| 18 United States Code § 894 | Using extortionate means to collect on extortionate extensions of credit |
| | Maximum Penalties: 20 years' imprisonment, $250,000 fine; 3 years' supervised release; $100 special assessment |

This criminal complaint is based on these facts:

Please see attached affidavit of FBI SA David VanderPorten in support of Complaint.

(approved as to form _____ AUSA Kevin Barry)

☑ Continued on the attached sheet.

_____
*Complainant's signature*

David VanderPorten, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6-22-17

_____
*Judge's signature*

City and state: ___San Francisco, California___

Hon. Maria-Elena James, U.S. Magistrate Judge
*Printed name and title*

1 - MfN

1   BRIAN J. STRETCH (CABN 163973)
    United States Attorney
2
    BARBARA J. VALLIERE (DCBN 439353)
3   Chief, Criminal Division

4   KEVIN J. BARRY (CABN 229748)
    Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-6840
7       FAX: (415) 436-7234
        Email: kevin.barry@usdoj.gov
8
    Attorneys for United States of America
9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                      SAN FRANCISCO DIVISION
12

13  UNITED STATES OF AMERICA,              )   No.
                                           )
14          Plaintiff,                      )
                                           )   **AFFIDAVIT OF FBI SPECIAL AGENT DAVID**
15      v.                                  )   **VANDERPORTEN IN SUPPORT OF**
                                           )   **CRIMINAL COMPLAINT AGAINST ROBERT**
16  ROBERT S. WONG, a/k/a "Fei Hong,"      )   **S. WONG, JEE CHUNG WONG, AND ZI XIAN**
    JEE CHUNG WONG a/k/a "Choong," and      )   **LI**
17  ZI XIAN LI, a/k/a "Jimmy,"             )
                                           )
18          Defendants.                     )   **Under Seal**
                                           )
19  _____

20                          **INTRODUCTION**

21          I, David VanderPorten, Special Agent with the Federal Bureau of Investigation, being duly

22  sworn, depose and state as follows:

23  **I.      INTRODUCTION**

24          1.      I submit this affidavit in support of a criminal complaint and arrest warrants for Robert S.

25  WONG a/k/a "Fei Hong" (hereafter "WONG"), Jee Chung WONG a/k/a "CHOONG" (hereafter

26  "CHOONG"), and Zi Xian LI, a/k/a "Jimmy" (hereafter "Zi Xian LI").  As is set forth in further detail

27  below, there is probable cause to believe that WONG, CHOONG, and Zi Xian LI made extortionate

28

1  extensions of credit and used extortionate means to collect on extortionate extensions of credit, in

2  violation of Title 18, Untied States Code, Sections 892 and 894.

3  **II.     AGENT BACKGROUND**

4      2.      I am a Special Agent with the Federal Bureau of Investigation and have been so

5  employed since August 2008.  During my employment as a Special Agent, I have participated in

6  numerous drug, financial, and organized crime investigations.  In addition to my training at the FBI

7  Academy, I received training at the California Narcotic Officers' Association convention which

8  included detailed instruction in the many aspects of illicit manufacturing and distribution of marijuana,

9  cocaine, heroin, and methamphetamine.  I have also received training at the Attorney General's Money

10  Laundering conference, which included detailed instruction on money laundering activities.  I have

11  received training and was certified by the California Department of Justice authorizing the participation

12  of lawful interception of wire and electronic cellular telephone communications for California State wire

13  investigations, which included instruction on how to make lawful surreptitious recordings in California

14  State investigations.  During these investigations, I have gained expertise in law enforcement techniques

15  including the use of physical surveillance and electronic surveillance techniques such as Title III

16  wiretaps, pen registers and traps, pole cameras, and global positioning satellite tracking devices.  I have

17  experience in the use of undercover agents and informants to collect evidence with body recorders and

18  transmitters.  I have experience analyzing toll records, financial records, and utility records.  The

19  investigations on which I have worked have resulted in the arrests of multiple individuals and the seizure

20  of a variety of items of evidence.

21      3.      I have participated in four investigations involving the interception of communications

22  pursuant to Title III.  Three of the investigations focused on Asian organized crime, including

23  racketeering, loan sharking, and drug trafficking.  As a result of this experience, I am familiar with the

24  use of wiretaps as an investigative technique.  I have been an affiant on search warrants, seizure

25  warrants, criminal complaints, and wiretaps.

26      4.      I am presently assigned to investigate organized crime matters and based at the San

27  Francisco Field Office of the FBI.  As part of my duties within this unit, I investigate violations of

28  federal law, including narcotics trafficking, violent crimes, racketeering, and money laundering

1   committed by Asian organized crime groups. I also speak some limited Cantonese, enough to perform

2   basic translations.

3       5.      I am an investigative or law enforcement officer of the United States, within the meaning

4   of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of and to make arrests for

5   offenses enumerated in 18 U.S.C. § 2516.

6       6.      The facts set forth in this affidavit are based upon my personal observations, my training

7   and experience, and information obtained from other agents and witnesses. This affidavit is intended to

8   demonstrate only that there is sufficient probable cause for the requested search warrant, and does not

9   purport to set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all

10  conversations and statements described in this affidavit are related in substance and in part only. The

11  summaries of recorded conversations set forth in this affidavit may include notes and interpretations

12  provided for context or clarity by translators or investigators.

13  **III.   CASE SUMMARY**

14      7.      Beginning in April 2015, after receiving information from an extortion victim who later

15  became a confidential human source, "CHS,"[1] the FBI began investigating a group of individuals

16  involved in loansharking and extortionate collections of unlawful debt in the San Francisco Bay Area

17  and headed by Robert S. WONG.

18      8.      At the beginning of this investigation, investigators learned that WONG extended

19  extortionate credit to CHS, and then utilized extortionate methods to attempt to collect the principal and

20  interest. The original debt for which CHS reported she/he was getting extorted was approximately

21  $30,000 at an 8% monthly interest rate. When CHS was not able to retire the debt over time, CHS had a

22  series of discussions with WONG, and WONG agreed to stop the accumulation of interest, but CHS had

23  to pay almost $60,000 to WONG. CHS made regular payments to WONG from April 2015 through

24

25      [1] CHS's criminal record includes a 1992 misdemeanor conviction for receiving stolen property,
26  and a 2001 arrest, but no conviction, for disorderly conduct, which was related to prostitution activity.
    CHS is assisting law enforcement for protection from threats made by WONG and others and for
27  occasional payment of extortionate debt to those individuals. Based on the corroboration of CHS's
    statements through review of recorded conversations with WONG, CHOONG, and ZI XIAN LI and
28  through other independent investigation, I believe CHS to be reliable.

1  June 2017.

2      9.    In June 2016, WONG advised CHS that he had a new loansharking partner, known at the

3  time only as "CHOONG," but whom agents identified as Jee Chung WONG in March 2017, referred to

4  in this document as "CHOONG."[2]  CHS has provided extortion payments to CHOONG for the debt

5  owed to WONG as recently as May 2017.

6      10.    In addition, in August 2016, CHOONG made an extortionate extension of credit of

7  $2,500 to a third person, referred to here as "Victim Z."

8      11.    Investigators have learned that Zi Xian LI has also threatened CHS with physical harm

9  related to extortionate loans.  Zi Xian LI is also connected to WONG, as he introduced CHS to WONG

10  for CHS's initial extortionate loan prior to March 2015.  During approximately April 2016, CHS took a

11  loan from Zi Xian LI at a 10% monthly interest rate.  CHS continues to pay this loan back to Zi Xian LI

12  with his/her own money.  Zi Xian LI has threatened CHS with physical violence as a result of slow or

13  delayed payments.  Zi Xian LI told CHS that he and WONG use the same group of violent loan

14  collectors, individuals who are reportedly Vietnamese and based in San Jose.  Recorded discussions

15  between CHS and Zi Xian LI show that Zi Xian LI is aware of the amount that CHS owes to WONG.

16  On at least one occasion, Zi Xian LI has scolded CHS regarding CHS's late extortion payments to

17  WONG, demonstrating the connection between the two.

18  **III.    APPLICABLE LAW**

19      Under 18 U.S.C. § 892, it is unlawful for any person to make or conspire to make extortionate

20  extensions of credit.

21      Under 18 U.S.C. § 894, it is unlawful for any person to knowingly participate or conspire to

22  collect or attempt to collect any extension of credit or to punish any person for the non-repayment

23  thereof.

24  //

25  //

26  //

27

28      [2] Agents identified CHOONG as Jee Chung WONG by accessing banking records and a photograph from an ATM that surveillance agents saw him use.

IV.     **STATEMENT OF PROBABLE CAUSE**

A.      **ROBERT WONG**

1) **WONG'S Extortionate Extension of Credit to CHS**

12.     The FBI has collected evidence since April 2015 that Robert S. WONG, a/k/a "Fei Hong," is a loanshark operating in the San Francisco Bay Area and extends extortionate loans to victims at usurious rates. Based on information from CHS and through recorded conversations, agents have learned that WONG charges his victims 8 to 10% weekly interest on loans that range from approximately $1,000 to $20,000, and agents have identified more than 30 of WONG's victims. WONG utilizes extortionate means to collect the debts, including threats of physical violence. Investigators have learned that WONG carefully selects people from the Chinese community to whom he loans money, individuals who are vetted by criminal associates as possible loansharking victim-customers. The investigation has shown that WONG meets the potential victim in person, takes a photo of his/her driver license, and determines where they reside and what means the victim will have to repay WONG. When a victim wants to borrow more money at a later date, WONG assesses whether the victim can continue the weekly interest payments.

13.     At some point prior to March 2015, CHS and a third person borrowed money from WONG at 8% weekly interest. By March 2015, CHS owed approximately $30,000 to WONG. CHS reported to the FBI that she/he was being extorted and threatened with violence for non-payment on the 8% weekly loan. After providing background information in CHS's initial debriefing with FBI, CHS agreed to wear a recording device when meeting with WONG or his associates. Through the course of this investigation, CHS has made 23 payments to WONG or his associates, totaling in excess of $35,000. Listed below are two examples of the extortion payments and the recordings of the telephone calls that led up to the payments.

2) **WONG's Extortion of CHS on April 10, 2015**

14.     On April 10, 2015, CHS contacted WONG and one of his associates in a recorded telephone call and made arrangements to pay $2,000 to WONG at a coffee shop in San Francisco, to which WONG agreed.

15.     On the same day, from approximately 3:13 pm to 3:25 pm, while wearing a recording

device, CHS met with WONG and made a $2,000 payment using CHS's own money. WONG told CHS that the amount paid was small and suggested that CHS should pay the debt in $3,000 to $4,000 monthly installments. WONG advised that no matter CHS's difficulties, the debt was still owed. CHS asked WONG to halt the accrual of interest and WONG agreed, but only if CHS also agreed to double the current principal from $28,000 to $56,000. CHS advised that he/she did not have the money to pay such a large sum, and in reply, WONG told CHS to sell belongings. CHS offered to work for WONG, and WONG said that he already had many people working for him and did not need CHS. WONG said that CHS was tying up WONG's money, and wanted to know how the debt would be repaid. WONG advised that he has to "eat," meaning he has to make a living. CHS told WONG that CHS would think of a way to pay WONG, but WONG cursed and scolded CHS saying that CHS should have thought about a way to pay already. WONG told CHS that WONG had to pay others' salary with the money owed, and that WONG was getting money to which he was entitled. WONG told CHS that he only cared when and how much money CHS would pay to WONG monthly.

16.     At approximately 3:14 pm, while standing on the public street in view of surveillance agents, WONG physically grabbed CHS by the shoulder and neck area. CHS felt threatened and immediately agreed to pay WONG a monthly payment. WONG told CHS to re-contact him on April 13, 2015 to inform WONG as to how much CHS would pay monthly.

17.     Three days later, on April 13, 2015, CHS contacted WONG in a recorded conversation. CHS told WONG that she/he did not believe that CHS should have to pay principal and interest on the loan money, and WONG began to verbally threaten CHS again. CHS advised WONG that she/he should not have to pay interest, only principal, and also that CHS's neck still hurt where WONG grabbed her/him during their previous meeting on April 10, 2015. WONG told CHS that CHS had not been hurt yet, and that CHS may need a trip to the hospital. WONG indicated that CHS would know when CHS was beaten, and that no beating had taken place yet. CHS agreed to pay $2,500 per month to WONG, which he accepted, and WONG calmed down.

### 3) **WONG and CHOONG's Extortion of CHS in Sept 2016 to Oct 2016**

18.     Following the April 10, 2015, payment to WONG, CHS continued to make monthly payments, often in the $2,500 amount to which they agreed. As time went on, however, and at agents'

direction, CHS began lowering the payment amount and delaying the time of payment. This was noted by WONG, and WONG complained about it, but the complaints changed to threats in September and October of 2016.

19.    During that period, CHS made a number of calls to WONG, indicating that he did not have the money to make payments, but promising to pay later. As the payments became increasingly delayed, WONG became increasingly angry.

20.    On October 19, 2016, CHS recorded a phone call with WONG. CHS advised WONG that CHS did not have the money and requested another week. CHS advised WONG there was no intention of dragging out the payment. After CHS suggested paying the following Thursday, WONG replied ". . . You mother fucker, it is not just a couple of days, it is over a week!" CHS explained CHS needed time to get the money. WONG then began to curse and hurl insults at CHS, increasing the volume of his voice. WONG claimed CHS was "full of shit" and it was "not fucking acceptable for [CHS] to just casually give a fucking date to brush him off . . ." WONG told CHS that he demanded an extra $500 if CHS could not pay the following week. WONG yelled, ". . . it has been dragged on for two months now, motherfucker; you think I am playing games here?" CHS told WONG that CHS was not playing games, and that CHS did not have the money. WONG then challenged and dared CHS to come out and meet with WONG. WONG called CHS a bastard and told CHS to "eat shit." WONG screamed at CHS that ". . . you motherfucker, the rent alone is more than several tens of dollars [Cantonese phrasing]. Fuck you, mother fucker. Fuck you . . ." WONG then warned CHS, ". . . you motherfucker, you better be prepared for the unexpected if you do not give it to me next Thursday. . ." WONG continued to hurl expletives to CHS and asked if CHS "gets it." CHS replied "get what?" and WONG screamed at CHS that CHS was snubbing him. CHS told WONG that CHS would not dare to delay paying WONG. WONG continued to berate CHS, and challenged CHS to come out to meet WONG. WONG then repeatedly—and graphically—insulted CHS and his mother, eventually saying, ". . . don't let me come to your house, I will beat you up and send you to the hospital. Motherfucker, don't get me mad, I fuck your mother." WONG warned CHS again "You motherfucker, be prepared for the unexpected if I don't get it on Thursday, no fucking need to talk anymore." CHS replied "OK," and the call ended.

21.     At approximately 3:17 pm on October 26, 2016, CHS recorded a phone call with WONG. CHS told WONG that CHS was getting $500 later and wanted to pay WONG. WONG asked what time and CHS replied around 5 or 6 pm. WONG agreed. CHS suggested meeting "CHOONG," an associate of WONG's whom WONG had earlier introduced to CHS, and who had collected payments from CHS on WONG's behalf in the past, and WONG concurred. As discussed above, agents later identified "CHOONG" as Jee Chung WONG. Robert WONG asked CHS to call him after paying CHOONG, and CHS promised to do so.

22.     At approximately 5:58 pm on October 26, 2016, CHS recorded a phone call with CHOONG. CHS coordinated a meeting with CHOONG during this call, with a meeting location in San Francisco tentatively within 45 minutes. In the call, CHOONG commented that "I'm not the one that is after you [CHS]." CHS stated, "Fei Hong [WONG] was chasing after [CHS] . . . . Fei Hong has been calling." CHOONG asked CHS "how much do you owe Fei Hong?" and CHS replied, "several ho," which is a slang Cantonese phrase that can mean either hundreds or thousands. CHS asked CHOONG where he was and CHOONG replied he was going to be near Japantown in San Francisco later. CHOONG told CHS, "don't worry, tell him [WONG] that you are giving it to CHOONG, and he will understand." CHS said, "yes, yes, he [WONG] said to give it to you." CHOONG and CHS agreed to meet in San Francisco near a restaurant in the vicinity of Japantown in San Francisco for CHS to provide the payment. CHOONG told CHS, "Call Fei Hong, tell him that you are meeting CHOONG later to give it to him [CHOONG]; he will understand." CHS replied, "I talked to him already and he asked that you [CHOONG] call him [WONG]." CHOONG replied, "Ok, ok, no problem." CHOONG and CHS agreed to meet later.

23.     At approximately 7:26 pm on October 26, 2016, CHS was provided an activated audio recording device and prepared to pay $500 of CHS's own money as an extortion evidence purchase with CHOONG. From approximately 7:37 pm to 7:47 pm, CHS met with CHOONG in the vicinity of Shabu House Restaurant, 354 Clement Street, San Francisco, California, in a controlled law enforcement operation to provide a $500 extortion payment to CHOONG.

24.     In the meeting, CHOONG asked CHS if WONG was "pressing fucking hard on [CHS]." CHOONG commented " . . . Fuck, so much free time . . ." CHS asked CHOONG to give the money to

WONG on CHS's behalf.  CHS advised CHOONG that CHS did not have the other $200 that CHS owed to CHOONG from another debt between them.  During the meeting, CHOONG answered a call from WONG and confirmed to " . . . big brother Fei Hong that it [money] was given to him by CHS."  CHOONG then asked if CHS had a way to locate a third party (determined to be Victim Z, discussed below), an extortion victim to whom CHS previously introduced CHOONG.  CHOONG told CHS that he was not placing the other person's [Victim Z's] debt upon CHS.  CHS told CHOONG that CHS had purportedly been trying to get in contact with Victim Z constantly.  CHOONG advised that he was covering the payment every two weeks to WONG.  CHOONG continued to ask CHS to try to contact or locate Victim Z.

25.     At approximately 8:27 pm on October 26, 2016, CHS recorded a phone call with WONG.  CHS informed WONG that CHS had given the money to CHOONG.  WONG advised that he had already received confirmation from CHOONG.  WONG told CHS that CHS still had a balance of $8,000, and CHS promised to call WONG as soon as the money was available.

26.     Based upon the foregoing, I believe that there is probable cause to believe that WONG has committed violations of 18 U.S.C. §§ 892 and 894.  I believe that when WONG utilized physical contact with the aforementioned victim on April 10, 2015, he was using force to compel CHS to pay him.  I also believe that WONG used the threat of violence to scare CHS in the discussions relating to the April 10, 2015 payment.  When CHS advised that she/he still felt pain where WONG grabbed and WONG replied that CHS would know when she/he had been beaten, it was an example of how WONG uses threats and intimidation to compel victims like CHS to make payments.  I believe that the payment CHS made to CHOONG, coordinated through WONG, was an example of how CHOONG and WONG conspired to extort CHS.  I believe that the recorded calls between CHS and WONG during September and October 2016 were examples of how WONG used threats of violence to scare his victims into paying on the extortionate loans.

**B.     JEE CHUNG WONG, a/k/a "CHOONG"**

27.     The FBI has collected evidence beginning in October 2016 which shows that Jee Chung WONG, a/k/a "CHOONG." is a criminal associate of Robert S. WONG.  CHS learned and advised FBI agents that during mid-2016, WONG began working with a new partner, known at the time only as

CHOONG.  WONG introduced CHS to CHOONG as a new partner in June 2016.  CHOONG has been involved with four collections from CHS on WONG's behalf for a total of $2,000.  CHOONG has also extended extortionate loans to a new victim, referred to as "Victim Z" in this affidavit, whom CHS introduced to CHOONG.  When Victim Z did not make payments to CHOONG, CHOONG attempted to get CHS to collect on his behalf.  Although CHOONG directly extended the loan to Victim Z, according to CHS, it was understood by CHS and Victim Z that the money actually came from WONG.  Summarized below are extortion payments that CHOONG has been involved in with CHS.

### 1) February 5, 2017 Phone Call with CHOONG Regarding Victim Z

28.     In August 2016 a gambling acquaintance of the CHS, referred to as Victim Z, asked CHS to borrow $2,000 while at a casino.  CHS was friendly to Victim Z and characterized their relationship to be that of fellow gamblers.  CHS was going to loan money to Victim Z, something CHS has done with many other fellow gamblers in the past.  At the time of Victim Z's request, CHS did not have money to loan.  CHS suggested Victim Z could get money from a car title loan company or a bank.  Victim Z told CHS that the money was needed immediately.  CHS suggested that Victim Z could get money from Fei Hong (WONG) a loanshark with whom they were both familiar.  Victim Z said that the money was needed immediately, and Victim Z wanted it from a loanshark, since loansharks can provide such loans quickly, and Victim Z asked CHS to contact one.

29.     Without consulting handling agents, and without their direction, CHS called CHOONG that night.  The call was unrecorded, and CHS arranged a meeting of Victim Z and CHOONG that night.  At Victim Z's request, CHS escorted Victim Z to a meeting at the Joyful Kitchen restaurant on Ocean Avenue in San Francisco.  CHOONG met Victim Z at the restaurant and CHS was present when CHOONG gave $2,000 to Victim Z.  CHS overheard Victim Z and CHOONG agree that Victim Z owed $2,500[3] to CHOONG, and that the money was a loan from "Fei Hong" [WONG] at 10% interest per week.

30.     CHS later told agents that Victim Z missed the first payment due to CHOONG.  Within about a week of missing the payment, Victim Z asked CHS to collect $500 from Victim Z to give to

---

[3] Although CHS only saw $2,000 change hands, CHS heard CHOONG and Victim Z agree that the amount owed was $2,500.

1   CHOONG.  CHS met Victim Z in person in Oakland, and Victim Z gave CHS $500 for this purpose.

2   Victim Z told CHS that CHS had to give the money to CHOONG or else Victim Z would be in danger,

3   but Victim Z did not elaborate.  CHS took this to mean that Victim Z was either fearful of CHOONG,

4   WONG, or both due to their reputations because of the missed payment.  CHS later gave the $500 from

5   Victim Z to CHOONG.  CHS is not aware of any other payments that Victim Z made for this $2,500

6   loansharking debt.

7       31.   CHOONG told CHS that after he made the loan, Victim Z stopped paying the interest.

8   After August 2016, CHOONG contacted CHS multiple times and asked if CHS knew where Victim Z

9   was.  CHOONG was upset that Victim Z had not paid.  CHS advised CHOONG multiple times that

10   CHS had nothing to do with the loan or the collection of it.

11       32.   On February 5, 2017, CHS contacted CHOONG and recorded the call.  CHOONG

12   advised that his girlfriend had just seen Victim Z at the Bay 101 Casino in the San Jose area.  In the call

13   with CHS, CHOONG referred to Victim Z and was angry that Victim Z would gamble at a casino when

14   Victim Z still owed CHOONG money: "that fucking bitch [meaning Victim Z] is gambling . . . that

15   fucking bitch has money but she did not pay [CHOONG]."  CHS said that CHOONG should go find

16   Victim Z.  CHOONG told CHS that he could not go and instructed CHS to call CHOONG's girlfriend.

17   CHOONG further explained "that bitch is tying up [CHOONG's] debt and Victim Z was observed by

18   [his girlfriend] arriving at the casino and placing a $1,000 bet on the table . . . . She [Victim Z] has

19   money in the pocket."  CHOONG told CHS to call his girlfriend again.  CHOONG continued to curse ".

20   . . motherfucker, that bitch has not paid a single dollar."  CHS indicated that CHS would call the

21   girlfriend.

22       33.   Later the same evening, CHS re-contacted CHOONG and indicated that CHS had seen

23   Victim Z at the casino and that Victim Z was still there, but that Victim Z only had a little money on the

24   table.  CHS told CHOONG that Victim Z said that Victim Z would pay CHOONG soon.  CHS reported

25   to CHOONG that CHS purportedly obtained Victim Z's new phone number.  CHOONG then said ". . .

26   the motherfucker has money to gamble . . ."  CHS asked if CHOONG was coming to the casino, and

27   CHOONG said he was busy for the next few hours since he was working in Fremont.  CHS said

28   CHOONG could cuss Victim Z out in person.  CHOONG said he was busy but would call CHS later.

34.     During a debriefing with agents several day later, CHS reported this interaction.  CHS informed agents that CHS did go to the casino, saw Victim Z, and talked to Victim Z.  Victim Z told CHS to go away.  CHS left the area and reported that Victim Z likely left the casino before CHS called CHOONG, as CHS did not see Victim Z in the area when CHS returned.  In the debrief, CHS told agents that CHS felt compelled to go to the casino because of how angry CHOONG was.  After CHS informed agents of this activity, agents admonished CHS once again not to assist anyone in any manner, such as by talking with any victims or locating them, and CHS agreed.

### 2) **March 18, 2017 Contact with CHOONG**

35.     On March 18, 2017, CHS received two phone calls from CHOONG.  In the calls, which were not recorded, CHOONG advised CHS that he had gone to the address that Victim Z had listed on Victim Z's driver license.  CHOONG had taken a photograph of Victim Z's driver license prior to loaning money to Victim Z.  CHOONG told CHS that he asked construction workers at the address if they recognized Victim Z's photo, but there was no one there who recognized Victim Z.  CHOONG concluded that Victim Z had provided a false address.  CHOONG asked if CHS knew anything about Victim Z's address being false and if CHS knew Victim Z's true address.  CHS replied that CHS did not know any other addresses for Victim Z and told CHOONG that CHOONG knew more about Victim Z than CHS.

### 3) **November 23, 2016 Extortion Payment to CHOONG**

36.     From November 15, 2016, through November 23, 2016, CHS made multiple recordings of phone calls with WONG and CHOONG which pertained to a November 2016 extortion payment.  On November 23, 2016, with WONG's knowledge, CHS paid CHOONG $500.

37.     On November 14, 2016, CHS recorded a phone call with WONG.  CHS advised WONG that CHS did not have the money for the payment yet and would call as soon as the money was available.  WONG asked for a date when CHS would be able to pay.

38.     On November 21, 2016, CHS recorded a phone call with WONG.  WONG asked CHS what was going on and if CHS had been paid yet.  CHS said payday would be the upcoming Wednesday and CHS would call WONG then.  WONG reminded CHS to not delay paying WONG any further.

39.     On November 23, 2016, CHS recorded phone calls with CHOONG to coordinate a

1  meeting between CHS and CHOONG so that CHS could pay $500 on the debt owed to WONG.

2      40.     On November 23, 2016, CHS was provided an activated audio recording device and

3  prepared to pay $500 of CHS's own money as an extortion evidence purchase with CHOONG.  From

4  approximately 12:56 pm to 1:02 pm, CHS met with CHOONG in the vicinity of an apartment building

5  where CHOONG is believed to reside at 7800 El Camino Real, Colma, California, in a controlled law

6  enforcement operation to provide $500 to CHOONG.

7      41.     In the meeting with CHOONG, CHS provided the $500 for payment to WONG.

8  CHOONG accepted the money.  CHOONG began to discuss victim Victim Z, previously discussed with

9  CHS in the October 26, 2016 extortion payment. *See* ¶¶ 24, 28-34, above.  CHOONG stated that they

10  were going to give Victim Z more money but it was fortunate that they did not.  CHS purported to know

11  that many people are looking for Victim Z, that no one can find Victim Z, and that Victim Z has

12  disappeared.  Throughout the meeting, CHOONG asked CHS for details as to the whereabouts of Victim

13  Z.  CHS provided answers that purported to indicate that CHS had attempted to locate Victim Z, such as

14  driving by Victim Z's house, talking to associates, and driving by Victim Z's workplace.  CHOONG

15  advised CHS that he had to borrow money from another criminal associate to help pay for Victim Z's

16  extortion payment to WONG, but because no one could find Victim Z, CHOONG was planning to stop

17  making the payments to WONG.

18          **4)  April 27, 2017 Extortion Payment to CHOONG**

19      42.     On April 27, 2017, CHS paid $500 of FBI evidence purchase money to CHOONG in a

20  controlled law enforcement operation.

21      43.     At approximately 1:23 pm, CHS contacted CHOONG to ask CHOONG where CHS

22  could meet him.  CHOONG told CHS that he was at the Joyful Kitchen.  At approximately 3:01 pm,

23  prior to meeting with CHOONG, CHS contacted WONG.  In the call, WONG asked when CHS was

24  going to make the payment.  CHS told WONG that CHS would have the money in 1 or 2 hours and

25  WONG agreed.  CHS then contacted CHOONG and asked CHOONG where CHS could meet him.

26  CHOONG told CHS that he was at the Joyful Kitchen.

27      44.     At approximately 2:35 pm, CHS was provided with an activated recording device and

28  met with CHOONG from approximately 2:57 pm to 2:58 pm in front of the Joyful Kitchen located at

1919 Ocean Avenue, San Francisco, California.  CHS provided the $500 to CHOONG while standing on
the street in front of the Joyful Kitchen.  Shortly after, CHS departed the area and CHOONG returned
into the restaurant.

45.     In the recording, CHS asked what CHOONG was doing there (at the restaurant) and
CHOONG said he had to work.  CHS told CHOONG it was $500.  CHOONG asked CHS how was
business and CHS lamented that CHS made only "1 Gan" (meaning one hundred dollars).  CHOONG
cursed and said that CHS got only 1 Gan because CHS did not leave the house until 1 o'clock.
CHOONG asked if CHS went to Fat Kee [Artichoke Joe's Casino].  CHS replied that CHS ceased
gambling.  CHOONG exclaimed "Fuck, quit gambling?"  CHOONG and CHS continued with small talk.
At the end of the meeting, CHOONG promised to call him, meaning WONG.

46.     After the meeting with CHOONG, CHS contacted WONG and advised him that CHS had
given the payment to CHOONG.  WONG acknowledged the payment and told CHS that CHS's
remaining balance was now $6,000.

47.     Based upon the foregoing, I believe that there is probable cause to believe that Jee
Chung WONG, referred to here as CHOONG, has committed violations of 18 U.S.C. §§ 892 and 894.  I
believe that when CHOONG collected extortionate payments from CHS on WONG's behalf, he knew
that WONG was threatening CHS.  This is based on WONG's reputation in the gambling community
and on the context of CHOONG's statements to CHS.  For instance, CHOONG indicated to CHS that
he, CHOONG, was not after CHS, or was not chasing CHS, but rather, it was Fei Hong [WONG].  *See* ¶
22.  I believe that CHOONG acknowledged the threats WONG made to CHS when CHOONG asked
CHS if WONG was "pressing fucking hard on [CHS]."  *See* ¶ 24.  These statements were made just days
after WONG became irate with CHS over delayed and reduced payments and told CHS ". . . don't let
me come to your house, I will beat you up and send you to the hospital." *See* ¶ 20.

48.     I believe that when CHOONG extended a $2,000 loan to Victim Z and when CHOONG
advised Victim Z that the loan was from WONG at a 10% weekly rate, CHOONG conspired with
WONG to extend credit at a usurious interest rate.  I believe that based on WONG's reputation and
threats to CHS, that both CHOONG and Victim Z understood that threats and violence could be used in
the event of non-payment.  In fact, when Victim Z missed the first payment, Victim Z indicated that

1    he/she was afraid of CHOONG, and asked CHS to deliver the money in his/her place. I believe that

2    when CHOONG talked with CHS on March 18, 2017, about attempting to find Victim Z, see ¶35,

3    CHOONG was admitting that he was using extortionate methods to collect on the extortionate loan

4    previously extended to Victim Z. The payments summarized above from CHS to CHOONG show that

5    CHOONG has collected money on extortionate loans on the behalf of WONG, making CHOONG a co-

6    conspirator.

C.      **Zi Xian LI a/k/a JIMMY**

7

8         49.      The FBI has collected evidence which shows that Zi Xian LI a/k/a "Jimmy" is a

9    loanshark who extended a loan to CHS at usurious rates and who uses extortionate methods to collect on

10   the loan. ZI Xian LI was also the person that introduced CHS to WONG. In April 2016, without

11   consulting handling agents, CHS borrowed $10,000 from Zi Xian LI at 10% monthly rates. CHS

12   initially paid the loan interest on his/her own, but CHS eventually reported the existence of the

13   unauthorized loan in September 2016. CHS agreed to continue to pay the interest on the loan with

14   CHS's own money while wearing a recording device. Zi Xian LI has been involved with 5 extortionate

15   collections from CHS in excess of $4,100.

1)      **October 28, 2016 Payment to Zi Xian LI**

16

17        50.      From September 29, 2016 through October 28, 2016, CHS made multiple recordings of

18   phone calls with Zi Xian LI which pertained to the unauthorized loan CHS had made with him, and

19   specifically, an extortion payment on that loan. On October 28, 2016, CHS paid Zi Xian LI $1,000 of

20   CHS's own money.

21        51.      On October 28, 2016, at approximately 2:31 pm, agents provided CHS with an activated

22   audio recording device and prepared CHS to pay $800 of CHS's own money to Zi Xian LI. From

23   approximately 2:36 pm to 3:12 pm, CHS met with Zi Xian LI in the vicinity of Peet's Coffee shop at

24   5201 Geary Blvd, San Francisco, California. (CHS was originally supposed to pay $1,000 to Zi Xian

25   LI, but Zi Xian LI reduced the payment to $800 because CHS had previously paid $200 in another

26   form.) In the meeting with Zi Xian LI, CHS provided the $800 and Zi Xian LI affirmed the amount.

27        52.      Zi Xian LI asked CHS what CHS was planning to do about paying down the $10,000

28   debt, and he said that he could not cover for CHS. Zi Xian LI advised that the group from which that

debt originated consists of Vietnamese from the San Jose area, and they are "no joking matter." Zi Xian

LI advised CHS that when people from the group show up to collect, "[gun] shots are 100% certain"

which is why Zi Xian LI has advocated for CHS so many times. For example, Zi Xian LI told the

Vietnamese group that CHS was his friend. Zi Xian LI discussed an example of a person that did not

pay the group back, and that person was beaten so badly that his head looked like a pig's head. Zi Xian

LI suggested that CHS could pay $1,200 per month. Zi Xian LI continued to provide examples of

people who did not pay the group back promptly, saying that the members of the group chased victims

down. Zi Xian LI warned CHS to "think about it." In January 2017, the group would start charging

CHS $3,200 per month interest. If CHS did not make the payments, the group has methods of finding

people. Zi Xian LI said that they will go to the DMV to obtain CHS's picture ID and will lurk about the

casinos to look for CHS. Zi Xian LI also advised that WONG inquired about using the group to collect

from WONG's debtors. When one of WONG's debtors did not pay the group, someone from the group

shot the debtor in the thigh. WONG was surprised by the actions of the group.

53.     Zi Xian LI continued to provide other examples of the group's reputation for collection,

such as a kidnapping of an unidentified extortion victim. The people involved in the collections are

hardened, and if they go to jail, their families will be taken care of by the group. Zi Xian LI said that he

could try to appeal to the group to get CHS's monthly payment reduced to $2,400. Zi Xian LI repeats

that CHS should think over CHS's situation clearly because of the way the group operates. Zi Xian LI

was aware of the debt owed to WONG and indicated that CHS was paying for multiple debts. Zi Xian

LI warned CHS that they can find CHS or anyone for that matter in the United States.

**2) December 19, 2016 Payment to Zi Xian LI**

54.     From October 28, 2016, through December 9, 2016, CHS exchanged text messages and

made a recording of a phone call with Zi Xian LI which pertained to the next payment. On December 9,

2016, CHS paid $800 to Zi Xian LI for an extortion payment.

55.     On December 2, 2016, CHS recorded a phone call with Zi Xian LI. CHS explained the

payment wasn't much, but CHS was having some problems and was just a few days late paying him. Zi

Xian LI said this is a problem he warned CHS about before. Zi Xian LI said it will become troublesome

for CHS when January comes. Zi Xian LI said it is 10 now and it will become 32 and CHS won't be

1  able to do it. [Likely a reference to the current reduced payment $1,000 per month, as opposed to $800

2  per week, or $3,200 per month]. Zi Xian LI said he is trying to talk it down to 20 [$2,000 per month]

3  from 32 but he cannot say anything now when CHS is late paying. Zi Xian LI said he was scolded when

4  he called and they were wondering if Zi Xian LI is taking the money for his own purposes. Zi Xian LI

5  said he had made it clear to them and settled the matter, but Zi Xian LI did not know CHS would do this

6  [have a reduced payment]. Zi Xian LI told CHS to do whatever CHS wants. Zi Xian LI said if CHS

7  really has problem paying in the future, he suggested CHS to skip payment even for this month and go

8  into hiding. Zi Xian LI said he has done all he could for CHS.

9       56.    Zi Xian LI said he does not know what CHS is doing. Zi Xian LI said the whole world

10  knows CHS has many enemies. Zi Xian LI repeated that there is nothing he can do. CHS asked what

11  they are going to do. Zi Xian LI told CHS there is no need to ask. Zi Xian LI said they are the

12  scumbags. Not to mention "the metal [gun]"; several beatings would have leave CHS hurting, and Zi

13  Xian LI laughed. Zi Xian LI gave examples of the fat woman and the black girl. Zi Xian LI said they

14  looked like a pig's head. Zi Xian LI said he does not want CHS to fall into that.

15       57.    Later on December 2, 2016, CHS recorded another phone call with Zi Xian LI. Zi Xian

16  LI suggested CHS not pay the $1,000 due and to go into hiding as the monthly payment was going up to

17  $3,200 in January. CHS said that was equivalent to 8% interest per week, and Zi Xian LI confirmed

18  this. Zi Xian LI said that many people have repaid the principal and interest and that CHS was the only

19  exception. Others such as the "fat woman," the "black girl," and people from Lucky Chances [Casino]

20  have paid their principal and interest. Zi Xian LI scolded CHS for borrowing the money and not paying

21  it back within 3 months. Zi Xian LI advised that the people in the group are like brothers to Zi Xian LI

22  and they are troublesome but they back up Zi Xian LI and solve many problems for him. Zi Xian LI has

23  known them for many years. Zi Xian LI told CHS that they are not blood brothers. Zi Xian LI advised

24  CHS that the favorable terms of the loan were passed on to CHS, and CHS has not repaid the principal.

25  The group wants to cut their losses to CHS because they feel CHS is risky and not trustworthy.

26       58.    On December 3, 2016, CHS recorded a phone call with Zi Xian LI. Zi Xian LI asked

27  CHS why CHS still bothered to work since the money from work amounted to nothing. Zi Xian LI told

28  CHS something was going to happen. CHS asked what was going to happen, and Zi Xian LI responded

1   by laughing and accused CHS of playing trickery.  CHS denied any trickery and told Zi Xian LI that

2   CHS would have money next week.  Zi Xian LI told CHS that CHS should just go into hiding since

3   CHS would not have $3,200 per month in January.  CHS protested and said CHS was paying the $1,000

4   per month and they should not add more on top of the 10%.  Zi Xian LI told CHS that CHS was going

5   rogue and cursed CHS: "you mother fucker, how can I talk to them when you put me on the spot?  Are

6   you going to bring $10,000 to talk?  Mother fucker, record this and call the police, eat shit, you mother

7   fucking bitch, I am going to tell them I don't care anymore, you go eat shit."

8        59.    On December 9, 2016, CHS recorded a phone call with Zi Xian LI.  CHS told Zi Xian LI

9   that the money would be available in about an hour.  Zi Xian LI advised that he could not help the CHS,

10  and he asked CHS what was CHS going to do if CHS could not pay the money back by Christmas.  Zi

11  Xian LI provided an example of what the group did to an unidentified loanshark victim.  The

12  unidentified victim borrowed money from the group and had to sell his house to repay $300,000 to the

13  group.  Zi Xian LI speculated to CHS that due to CHS's current physical condition, there was no way to

14  know how long CHS would have to stay in bed after a few beatings.  Zi Xian LI discussed the

15  whereabouts of "Loong" (not another criminal associate), and said that everyone is looking for him.  Zi

16  Xian LI would pay anyone several thousand dollars if someone saw him.  Zi Xian LI suggested that

17  CHS should think about it; the group was charging extra to CHS because CHS is late on the payment,

18  and perhaps CHS could disappear into China.  Zi Xian LI also mentioned that the group was able to find

19  people in China.

20       60.    On December 9, 2016, at approximately 3:30 pm, CHS was provided an activated audio

21  recording device and prepared to pay $1,000 of CHS's own money as an extortion evidence purchase

22  with Zi Xian LI.  From approximately 3:45 pm to 4:00 pm, CHS met with Zi Xian LI in the vicinity of

23  Peet's Coffee shop at 5201 Geary Blvd, San Francisco, California, in a controlled law enforcement

24  operation to provide an $800 extortion payment to Zi Xian LI.  (CHS was originally supposed to pay

25  $1,000 to Zi Xian LI, but Zi Xian LI reduced the payment to $800 once again because CHS had

26  previously paid $200 in another form.)

27       61.    In the meeting with Zi Xian LI, he told CHS to give him $800.  Zi Xian LI then told CHS

28  that he promised to negotiate with people in the group on the behalf of the CHS, but CHS must give

1  something (money) to Zi Xian LI before negotiations began. Zi Xian LI did not know what to say to the
2  group, and he suggested that CHS should run away if CHS could not make the payments to the
3  Vietnamese company (group). Zi Xian LI told CHS that he would not give the $800 payment to the
4  group yet, and if CHS could not make the full repayment, CHS could come back to Zi Xian LI to take
5  the $800 back to run away.

6  ### 3) January 5, 2017 Payment to Zi Xian LI

7  62.   On December 30, 2016, CHS recorded a phone call with Zi Xian LI which pertained to
8  the next payment. On January 5, 2017, CHS paid $1,000 to Zi Xian LI for an extortion payment.

9  63.   On December 30, 2016, CHS recorded a phone call with Zi Xian LI. CHS told Zi Xian
10  LI he was working and that CHS will have money next week. Zi Xian LI asked CHS to listen up. Zi
11  Xian LI stressed to CHS the money has nothing to do with him [Zi Xian LI]. Zi Xian LI said he paid
12  and covered CHS for two months when CHS was late, and CHS was merely reimbursing Zi Xian LI. Zi
13  Xian LI said he is having a difficult time after making the two payments and has to stop. Zi Xian LI
14  explained that the younger brother of "the Vietnamese guy" struck a white woman with a car so hard
15  that she went flying before hitting the ground. Zi Xian LI said this happened out of town [unspecified].
16  Zi Xian LI noted she did not go [die] but suffered a lot of troubles.

17  64.   Zi Xian LI said he has known CHS for such a long time and does not want CHS to end up
18  with such trouble. Zi Xian LI said he is frustrated by the frequent phone calls asking about CHS from
19  the company. Zi Xian LI said he has a lot of things to deal with and does not want to be frustrated with
20  these. Zi Xian LI boasted that if it wasn't for Zi Xian LI, CHS would go to sleep [die] and wouldn't
21  know what happened. Zi Xian LI said that he was the one that sent messages to CHS when they
22  couldn't get a hold of CHS. Zi Xian LI warned that CHS could spend at least a couple of months in the
23  hospital if everyone takes a turn beating CHS. As a friend, Zi Xian LI said he does not want this to
24  happen to CHS.

25  65.   Zi Xian LI said if he did not deflect the problem, CHS would not be in the good shape
26  CHS is in today. Zi Xian LI recalled Fei Hong [WONG] told him that CHS was several months late.
27  Fei Hong [WONG] even wanted to give CHS a beating before asking CHS for payment. Zi Xian LI
28  says he replied "Fuck, it is not necessary." Zi Xian LI said all he had to do is say a few words and CHS

avoided a lot of trouble.  Zi Xian LI said they can do whatever they want because they have the address and know where the home is [referring to CHS].  Zi Xian LI said he has done his best for CHS.  Zi Xian LI said he has done his best for CHS as a friend.  Zi Xian LI recalled talking down the interest from the $2,000 to $1,000 when CHS was getting the loan.  Zi Xian LI said he spoke well of CHS and told them this is only for emergency and it was for two to three months.  Zi Xian LI said CHS is now putting him in a bad situation.  Zi Xian LI reminded CHS they will look for CHS by the end of the year.

66.     At approximately 11:02 am on January 5, 2017, CHS was provided an activated audio recording device and prepared to pay $1,000 of CHS's own money as an extortion evidence purchase with Zi Xian LI.  From approximately 11:31 am to 11:40 am, CHS met with Zi Xian LI in the vicinity of Peet's Coffee shop at 5201 Geary Blvd, San Francisco, California, in a controlled law enforcement operation to provide a $1,000 extortion payment to Zi Xian LI.

67.     Based upon the foregoing, I believe that there is probable cause to believe that Zi Xian LI has committed violations of 18 U.S.C. §§ 892 and 894.  I believe that when Zi Xian LI extended a $10,000 loan to CHS at a 10% monthly rate (120% annualized), Zi Xian LI extended credit at a usurious interest rate.  I believe that when Zi Xian LI discussed what type of violent actions happened to other people that owed money, and when Zi Xian LI discussed the aggressive nature of the company, and when Zi Xian LI discussed the increase of interest from 10% monthly to 32% monthly, Zi Xian LI was employing extortionate methods to instill fear in CHS to collect payments on the extortionate loans.

## V.     CONCLUSION

68.     Based upon the foregoing, I believe there is probable cause that Robert S. WONG, Jee Chung WONG, a/k/a "CHOONG," and Zi Xian LI, a/k/a "Jimmy," have violated sections of the United States Code as follows:

- Robert S. WONG made extortionate extensions of credit to victim CHS, used extortionate methods to collect on those extensions of credit through physical force and verbal threats, and conspired with others, including Jee Chung WONG a/k/a CHOONG, to collect from extortion victims, and made such collections himself, in violation of 18 U.S.C. §§ 892 and 894.

- Jee Chung WONG a/k/a CHOONG collected extortion payments from CHS and made an extortionate extension of credit to Victim Z, and conspired to do so with WONG, in

1    violation of 18 U.S.C. §§ 892 and 894.

2        • Zi Xian LI a/k/a Jimmy made extortionate extensions of credit to victim CHS and

3    used extortionate methods to collect on those extensions of credit through verbal threats of the

4    use of force, in violation of 18 U.S.C. §§ 892 and 894.

5    69.    Based on the foregoing, I request that a Criminal Complaint issue for the defendants

6    listed in this affidavit, based upon the probable cause described above.

7    **VI.    REQUEST FOR SEALING**

8    70.    Because this investigation is ongoing, disclosure of the Complaint, this affidavit, arrest

9    warrants, and/or related materials will jeopardize the progress of the investigation.  Disclosure could

10   result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of suspects.

11   Accordingly, I request that the Court issue an order that the search warrant, this affidavit in support of

12   the application for a search warrant, the application for a search warrant, and the attachments thereto,

13   along with the order itself, be filed under seal until further order of the Court.

14

15       Under penalty of perjury, I swear that the foregoing is true and correct to the best of my

16   knowledge.

17
                                        _____
18                                        DAVID VANDERPORTEN
                                          FBI Special Agent
19
     Subscribed and sworn to before me this ____ day of June, 2017,
20

21   _____
22   HON. MARIA-ELENA JAMES
     United States Magistrate Judge
23

24

25

26

27

28